IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

UNITED STATES OF AMERICA,

         Plaintiff,

vs.                               No. 3:21-CR-00070

ABDUL INUSAH,

         Defendant.

_____/


---o0o---

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

JURY TRIAL, DAY ONE

PARTIAL TESTIMONY OF KENNETH EMENI

TUESDAY, AUGUST 9, 2022, 3:16 P.M.

---o0o---


For the Government:     UNITED STATES ATTORNEY'S OFFICE
                         300 Virginia Street East, Suite 4000
                         Charleston, West Virginia 25301
                         BY:  KATHLEEN ROBESON
                         and  R. GREGORY MC VEY
                         Assistant United States Attorneys

For the Defendant:      WESTON ROBERTSON
                         337 Fifth Avenue
                         Huntington, West Virginia 25701
                         BY:  CONNOR D. ROBERTSON


Reported by:   KATHY L. SWINHART, CSR
                Official Court Reporter
                (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

```
1                           INDEX

2
     GOVERNMENT'S WITNESSES:                        PAGE:
3
4    KENNETH EMENI

5    DIRECT EXAMINATION BY MR. MC VEY                 1

6

7

8

9

10        GOVERNMENT'S EXHIBITS RECEIVED IN EVIDENCE

11   NO.:                 DESCRIPTION:              PAGE:

12    1    Emeni plea agreement                       3

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

1      HUNTINGTON, WEST VIRGINIA

2      TUESDAY, AUGUST 9, 2022, 3:16 P.M.

3                    ---o0o---

4      (Jury present.)

5                    * * * * *

6      (Other proceedings reported, not transcribed.)

7                    * * * * *

8      THE COURT:  All right.  You may call your first

9  witness.

10      MR. MC VEY:  Yes, Your Honor.  The United States calls

11  Kenneth Emeni.

12      THE CLERK:  Please raise your right hand.

13      **KENNETH EMENI, GOVERNMENT'S WITNESS, SWORN**

14      THE WITNESS:  Yes, I do.

15      THE CLERK:  Have a seat.

16      THE COURT:  You may remove your mask while you're

17  testifying.

18                **DIRECT EXAMINATION**

19  BY MR. MC VEY:

20  Q.  State your name for the record, please.

21  A.  Kenneth Emeni.

22  Q.  How do you spell your last name?

23  A.  E-M-E-N-I.

24  Q.  All right.  What state do you live in currently?

25  A.  West Virginia.

2

1   Q.  Are you employed?

2   A.  Yes, sir.

3   Q.  How are you --

4       THE COURT:  Pull that microphone closer to you.

5   BY MR. MC VEY:

6   Q.  How are you employed?

7   A.  I am employed by FedEx currently.

8   Q.  Did you previously plead guilty in this court to a money

9   laundering conspiracy?

10  A.  Yes, sir.

11  Q.  And was that plea a result of a plea agreement with the

12  United States?

13  A.  Yes, sir.

14  Q.  When you entered into that plea agreement, did you have a

15  lawyer to represent you?

16  A.  Yes, sir.

17  Q.  Have you been sentenced?

18  A.  No, sir.

19  Q.  And are you currently pending sentence for that?

20  A.  Yes, sir.

21  Q.  I want to show you on the screen what's been marked for

22  identification purposes as United States Exhibit 1.  If you

23  can look on that screen there to your side.  Yes, please.

24      Do you see that exhibit on the screen, Mr. Emeni?

25  A.  Yes, sir.

3

1   Q.  And do you recognize that exhibit?

2   A.  Yes, sir.

3   Q.  What is that?

4   A.  Ah --

5        THE COURT:  Please direct your voice at the microphone

6   when you're testifying.

7        THE WITNESS:  That's a plea agreement.

8   BY MR. MC VEY:

9   Q.  Okay.  Is that a copy of the plea agreement you entered

10  into?

11  A.  Yes, sir.

12  Q.  All right.  And is that your signature there and initials

13  on that particular document?

14  A.  Yes, sir.

15       MR. MC VEY:  Your Honor, we'd move into evidence

16  United States Exhibit 1.

17       THE COURT:  Any objection?

18       MR. ROBERTSON:  No objection, Your Honor.

19       THE COURT:  Exhibit 1 is admitted.

20      (GOVERNMENT'S EXHIBIT 1, Emeni plea agreement,

21      ADMITTED INTO EVIDENCE.)

22  BY MR. MC VEY:

23  Q.  What is your understanding of what that agreement requires

24  of you?

25  A.  Umm, it's an agreement that state that I conspired in

4

1    money laundering.

2    Q.  All right.

3    A.  Yeah.

4    Q.  And as part of your agreement, did you agree to cooperate

5    with the United States and testify here today?

6    A.  Yes, sir.

7    Q.  What is your understanding of what -- any award or

8    anything that you'll get as a result of your testimony?

9    A.  No, sir, it's just the plea agreement that I agreed to.

10   Q.  All right.

11          THE COURT:  Please make sure you speak loudly and

12   distinctly.  It's a little hard to understand you.

13          THE WITNESS:  Okay.

14   BY MR. MC VEY:

15   Q.  Now, you stated you pled guilty to a money laundering

16   scheme.

17       Could you describe the money laundering scheme you were

18   involved in?  How did it work?

19   A.  I allowed victims to transfer money, my co-conspirator to

20   transfer money to my account, and I send it back to them, and

21   they give me a part for it.

22   Q.  Now you say you worked with co-conspirators.  Who were

23   they?

24   A.  They are in Africa.

25   Q.  All right.  Were there other co-conspirators here in the

5

1    United States?

2    A.  Yes, sir.

3    Q.  Who were they?

4    A.  Ah, my friends over here.  We attended Marshall

5    University.

6    Q.  All right.  What are their names?

7    A.  Ah, Harrison.

8           THE COURT REPORTER:  Say it again.

9           THE WITNESS:  Harrison, John.  Kenneth.  Umm --

10   BY MR. MC VEY:

11   Q.  Another Kenneth?

12   A.  Yeah, another Kenneth.

13   Q.  Okay.

14   A.  Inusah.  Awolesi.  And that's all I can remember right

15   now.

16   Q.  Okay.  When you say Inusah, who are you referring to?

17   A.  JB.

18   Q.  Okay.  JB?

19   A.  Yeah.

20   Q.  Is that a nickname that Mr. Inusah had?

21   A.  Yes, sir.

22   Q.  And when you refer to Mr. Inusah, is he present in the

23   courtroom today?

24   A.  Yes, sir.

25   Q.  Could you identify him, please, for the jury by telling us

6

1   what he's wearing and where he's sitting?

2   A.  He is sitting right there in the white suit.

3           THE COURT:  He's identified the defendant.

4           MR. MC VEY:  Thank you, Your Honor.

5   BY MR. MC VEY:

6   Q.  Let's talk about some terms that are used within your

7   scheme that you had.

8       What does the term "job" mean?

9   A.  Ah, it just mean, like, what I explain just now, like, the

10  money coming to your account and sending it back to them.

11  That's what I describe as a job.

12  Q.  Okay.  And when you -- do you -- are you familiar with the

13  term "client"?

14  A.  Yes.  These are -- these are victims sending me money.

15  Q.  All right.

16  A.  Yeah.

17  Q.  And how -- you say they're victims sending you money.  How

18  is it that in the schemes the victims came to send you or

19  other co-conspirators money?

20  A.  Ah, it's much more easier for them to send us money

21  because we're over here in the United States.  Transferring

22  money back to Africa is going to create a lot of questions.

23  That is why we are being used over here.

24  Q.  So how did you contact -- how was contact made with the

25  victims?  What means did you use to do that?

7

1    A.  I don't really know about making contact with the victim.

2    It's just those back in Africa that make contacts with them.

3    Q.  Okay.  So your role didn't have anything to do necessarily

4    with communicating with the victims; is that correct?

5    A.  Yes, sir.

6    Q.  Others that were involved did that?

7    A.  Yes, sir.

8    Q.  Okay.  You sort of explained this to some degree.

9         Why did co-conspirators use your bank account rather than

10   their own?

11   A.  Ah, the reason I just stated to you.  Like, they wire

12   transfer from the United States back to Africa is going to

13   create a lot of clauses [phonetic] and a lot of questions --

14        THE COURT REPORTER:  I'm sorry.  Is going to create a

15   lot of what?

16        THE WITNESS:  Clauses, clause [phonetic].  It is going

17   to create a lot of clause [phonetic] and question at the bank,

18   like, if they transfer money out of the state.  It's going to

19   create a lot of questions.

20   BY MR. MC VEY:

21   Q.  Questions?

22   A.  Yeah.

23   Q.  All right.  And what did you receive for your part?  How

24   would -- what did you benefit from this?

25   A.  Ah, say, like, 10 to 15 percent from most of the

8

1    transaction, not all of it.

2    Q.  Okay.  So when transactions, say, would come to your --

3    did you have transactions in your account?

4    A.  Yes, sir.

5    Q.  So when transactions would come to your account, then,

6    what would you do with that?

7    A.  Ah, I take it out.  Then I send it -- like, they tell me

8    what to do.  I send it to them or they tell me to, like, send

9    to someone over here.  That is what they do.

10   Q.  All right.  And you would keep, as you stated --

11   A.  Yes.

12   Q.  -- 10 to 15 percent?

13   A.  Yes, sir.

14   Q.  Now, you stated you were a Marshall student; is that

15   correct?

16   A.  Yes, sir.

17   Q.  What years were you a Marshall student?

18   A.  What year?

19   Q.  Years.

20       When were you a Marshall student?

21   A.  I was at Marshall from 2017 to 2019.

22   Q.  All right.  And during that time, was Mr. Inusah also a

23   Marshall student?

24   A.  Yes, sir.

25   Q.  Is that how you met him?

9

1   A.  Yes, sir.

2   Q.  Did you meet him immediately upon coming to Marshall?

3   A.  No, sir.

4   Q.  When did you meet him approximately?

5   A.  The fall of 2017.

6   Q.  I want to direct your attention to the spring of 2019 and

7   ask if you and the defendant, Mr. Inusah, ever worked a fraud

8   job together.

9   A.  No, sir.  We did not.

10  Q.  Are you familiar with an individual that is at least known

11  by Joshua Basuma?

12  A.  Yes, sir.

13  Q.  Okay.  Who is that, if you know?

14  A.  I transfer money to him in Ghana.  And Mr. Inusah

15  instructed me to do that.

16  Q.  Okay.

17  A.  Yes, sir.

18  Q.  So tell us about that.  What did he instruct you to do?

19  A.  Ah, we use a platform called Ping Express in transferring

20  money, and there are other platforms, too, for transferring

21  money.  So I believe maybe he has gotten to his limits that

22  day.  He give me about -- about 2,200 or $3,000, I can't

23  remember.  He ask me to transfer the money.  He gave me names

24  to transfer it to, and that is one of the names.

25  Q.  All right.  Do you recall approximately when that was?

10

1    A.  You said what?

2    Q.  Do you recall approximately when that was?

3    A.  No, sir, I can't remember.

4    Q.  That would still have been within the time that you knew

5    Mr. Inusah here at Marshall; is that correct?

6    A.  Yes, sir.

7    Q.  How many transactions were done during this particular job

8    to Mr. Inusah?

9    A.  Just one.

10   Q.  Do you recall how much money in total you sent?

11   A.  The limit, I think, per day was possibly 1,800.  I

12   remember I sent about 1,650 or 1,750.  Because if you get

13   close to your limit, maybe the transaction can decline.  So I

14   did not send all of it that day, all one sitting.

15   Q.  Did you send more at another time?

16   A.  I sent it to another name.

17   Q.  I'm sorry?

18   A.  I sent it to another name.

19   Q.  To another name?

20   A.  No, not to Joshua Basuma was it.  I sent it to another

21   name.

22   Q.  And, again, both of those were at the direction of this

23   defendant?

24   A.  Yes, sir.

25   Q.  Do you know whether or not -- let me take that back.

11

1      During the time you were at Marshall with Mr. Inusah, do

2   you know whether he had a job?

3   A.  Yeah.  He work as a graduate assistant at the student

4   center with the black honor society.

5   Q.  During that time, did he own a car?

6   A.  Yes, sir.

7   Q.  More than one?

8   A.  He had one, I think.

9   Q.  Okay.

10  A.  But he change it, like, most often.

11  Q.  He changed it?

12  A.  Yes, sir.

13  Q.  Do you recall any of the cars that he owned during the

14  period that the two of you were at Marshall?

15  A.  I believe he uses Sonata, a Toyota Camry, and BMW.  Yeah.

16  Q.  Were there other indications to you that the defendant had

17  money?

18  A.  Ah, yes, sir.

19  Q.  Describe that.

20  A.  Ah, I would say, like, the way he present himself to

21  people.  Because I know I tell him before now, like -- if we

22  are at a party, you know, like sometimes we students, we have

23  parties, ah, he shows money around over there, I tell him not

24  to do that.  That is not something you want to do, like, show

25  money around at parties.  I tell him not to do that.

12

1    Q.   Why did you tell him not to do that?

2    A.   Because it creates more, like, people -- create more

3    attention to you.  Yeah, that is why I told him that.

4    Q.   And why were you concerned that it would create attention?

5    A.   Because I know it's not legitimate money.

6    Q.   Now, you talked about how money was sent to your account.

7    A.   Yes, sir.

8    Q.   Were you aware that money was sent to others' accounts

9    working with you?

10   A.   Ah, yes, sir.

11   Q.   Okay.  Were you also aware that some of the individuals

12   that you worked with had more than one account?

13   A.   Yes, sir.

14   Q.   And was one of those individuals the defendant?

15   A.   Yes, sir.

16   Q.   Were you aware that at times money would be changed from

17   one account to another, both accounts belonging to the

18   defendant?

19   A.   Yes, sir.

20   Q.   Why would that happen?

21   A.   The reason most time that happen is for you to quickly

22   remove the funds from the account.  Like, I believe, like, the

23   limit for you to withdraw from bank account a day in the

24   United States is around $10,000, and you can't withdraw

25   $10,000 in one sitting.  That is why you, like, use different

13

1   platform, sending the money to other account to make quick

2   withdrawal of it.

3   Q.  Would that provide another layer that one would have to

4   look at to see all of the various transactions?

5   A.  Yes, sir.

6   Q.  I want to direct your attention, then, to February 16 of

7   2018 and ask if you took a trip out of state with the

8   defendant.

9   A.  Yes, sir.

10  Q.  All right.  And describe what you did on that day.

11  A.  Ah, that day, I was working at the student center.  Ah,

12  while I was working, because his office is close to mine, he

13  told me, like, he will be going to the bank, like, if I can go

14  with him because he was coming back, he can't drive, it was

15  going to be at night.  That was what he said.

16  Q.  All right.

17  A.  So I believe we left that day around, like, after 2:00

18  p.m., and the bank closes at 4:00.  We were able to make it to

19  our destination out of state.  We went to a Wells Fargo Bank.

20  I was inside the car, but he went inside all alone.

21  Q.  All right.  And do you recall particularly which state you

22  went to?

23  A.  No, I can't remember.  Because I was not acquainted to,

24  like, the area then because I just came to the United States

25  then.

14

1    Q.  Okay.  You stated you went to Wells Fargo Bank; is that

2    correct?

3    A.  Yes, sir.

4    Q.  And at some point, then, I take it the defendant returned

5    to the car; is that correct?

6    A.  Yes, sir.

7    Q.  What happened then?  Did you learn what he had done?

8    A.  When he got back to the car, I saw him with an envelope,

9    and he place the envelope in the console of the car, like, the

10   lock, and he place it over there.  That was where he place it.

11   Q.  Okay.  Did he have any discussion with you about what he

12   had done at Wells Fargo Bank?

13   A.  Before then, before he place the envelope in the console

14   of the car, he did a Snapchat video.  And I told him, like,

15   you started again.  Why are you doing all this?  He said that

16   is his lifestyle.  He said, I know that today.  That is what

17   he said.

18   Q.  Okay.  Were you aware of how much money he had obtained at

19   the bank?

20   A.  Umm, from my -- I would say, like, about 9,500 to 9,800.

21   That was without thinking.

22   Q.  Did you receive anything from this trip?

23   A.  Yes, sir.  When we got back, he dropped me at the -- close

24   to the student center and give me a hundred dollars --

25   Q.  Okay.

15

1   A.  -- from it, from the envelope.

2   Q.  When you returned to West Virginia, where did you first

3   go?

4   A.  Ah, he went to drop me close to the student center, the

5   student center.

6   Q.  All right.

7   A.  That is close to the library because we are having, like,

8   an African program at the student center that night.

9   Q.  Do you recall going to another bank when you arrived back?

10  A.  Umm, after that, I believe the fall of that year, I was

11  still working at the student center.  And it was raining that

12  day, and I told him, like, can you please give me a ride home?

13  He said he's going to the bank, that he is going to give me a

14  ride but he needs to go to the bank first.

15       And we went to PNC Bank.  It was on -- after, like,

16  downtown, after the bridge, South Point, Ohio, right here

17  after the bridge.

18  Q.  Okay.  And when you were at the bank, what happened?  Did

19  you go in the bank with him?

20  A.  Yes, sir.

21  Q.  What happened when you went into the bank with him?

22  A.  When I got inside the bank, the manager stated, like, do

23  you want to make a withdrawal?  He said yes.

24       And the manager ask him, like, are you making the --

25            MR. ROBERTSON:  Objection, Your Honor.  He's

16

1   testifying what a bank teller said.  It's hearsay.

2           THE COURT:  Sustained.  Rephrase your question.

3           MR. MC VEY:  Yes, sir.

4   BY MR. MC VEY:

5   Q.  When you were in the bank, you were able to hear the

6   conversation; is that correct?

7   A.  No, I was not able to hear the conversation.  I only went

8   inside the bank because it was raining.  I wanted to grab

9   coffee.

10  Q.  Were you aware of whether or not the defendant had a

11  business account in addition to personal accounts?

12  A.  I was not aware about that until I was inside the bank.

13  That was when I knew about it.

14  Q.  Did you learn which account, which type of account the

15  defendant received money from?

16  A.  Umm, the manager stated, like, if you want --

17  Q.  Did you know what --

18  A.  Yes.

19  Q.  Yes?

20  A.  Yes.

21  Q.  And are you familiar with whether that was a personal

22  account or a business account?

23  A.  It was a business account.

24  Q.  Are you familiar with the name of that business?

25  A.  I think the name of the business was Bistav or something

17

1   like that.  I can't really remember.

2   Q.  Bistav?

3   A.  Yeah, I think so.

4   Q.  When you learned that the account from which the defendant

5   got money at that time was from a business account, what was

6   your reaction to that?

7   A.  Umm, after that day, he dropped me at my place, and I

8   asked him, like, how did you open a business account?  He said

9   he did it online.  That was what he said to me.  He said he

10  did it online.  That was what he said.  And I said, okay, no

11  problem.

12  Q.  Why would you question whether he had a business account

13  or not?

14  A.  Because we international students, we not able to open a

15  business account apart from, like, your EIN or EUD [phonetic]

16  card or personal resident card -- permanent resident card.

17  Sorry about that.

18         MR. MC VEY:  If I may have a moment, Your Honor.

19      (Government counsel conferring.)

20  BY MR. MC VEY:

21  Q.  Just to go back to your testimony concerning moving money

22  from an account that one has to another account the same

23  person has.

24      Why would you want to do that quickly?

25  A.  Umm, because sometimes the bank, like, they place a hold

18

1    on your account.  If they find out, like -- if they have a gut

2    feeling, like, maybe this money is fraudulent or maybe if the

3    victim goes back to report that to them, like, he made a

4    fraudulent transaction, so they place a hold on the account.

5    Q.  And in the scheme that you were part of, was that a common

6    thing to do?

7    A.  Yes, sir.

8            MR. MC VEY:  That's all I have.

9                          *  *  *  *  *

10           (Other proceedings reported, not transcribed.)

11                          *  *  *  *  *

12                          ---o0o---

1    CERTIFICATION:

2         I, Kathy L. Swinhart, CSR, certify that the foregoing

3    is a correct partial transcript from the record of proceedings

4    in the above-entitled matter as reported on August 9, 2022.

5

6

7    August 10, 2022
     DATE

8

9    /s/ Kathy L. Swinhart
     KATHY L. SWINHART, CSR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25